UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | C.R. No. 19-054-JJM-LDA |
| | ) | |
| MONIQUE BRADY, | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Defendant Monique Brady again moves for a reduction in her sentence under 18 U.S.C. § 3582(c)(1)(A). ECF No. 41.[1] The Court sentenced Ms. Brady to ninety-six months of incarceration after she pleaded guilty to wire fraud in violation of 18 U.S.C. § 1343; corrupt endeavor to obstruct or impede the due administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a); and aggravated identity theft in violation of 18 U.S.C. § 1028A. She seeks release because of her alleged increased risk of serious harm if she were to contract COVID-19 and her family situation at home.

## I.   STANDARD OF REVIEW

Under 18 U.S.C. § 3582(c) and U.S.S.G. § 1B1.13, once a defendant shows that she has exhausted the Bureau of Prisons' ("BOP") administrative process for

---

[1] Ms. Brady moved for compassionate release on April 3, 2020 (ECF No. 38), and the Court denied the motion by text order on April 6, 2020 ("There is nothing unique about Ms. Brady's personal situation that would cause this Court to release her from imprisonment at this time.").

compassionate release,[2] or thirty days have lapsed without a decision, whichever occurs first, a district court may reduce a defendant's term of imprisonment provided the court determines: (1) extraordinary and compelling reasons warrant the reduction; (2) the defendant will not be a danger to the safety of any other person or the community; and (3) the sentencing factors outlined in 18 U.S.C. § 3553(a) favor release. *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13; *see also United States v. Miamen*, CR No. 18-130-1 WES, 2020 WL 1904490, at *2 (D.R.I. Apr. 17, 2020). The defendant carries the burden on a motion for compassionate release. *Miamen*, 2020 WL 1904490, at *2.

## II.   DISCUSSION

### A.   Extraordinary and Compelling Reasons

In 2006, the Sentencing Commission issued a policy statement with Application Notes that reiterates, without further definition, that reductions of sentences are authorized for "extraordinary and compelling reasons." U.S.S.G. § 1B1.13. The Application Notes to § 1B1.13 offer more guidance, setting forth four circumstances in which there might exist extraordinary and compelling reasons to grant a request for compassionate release: (A) medical condition of the defendant; (B) age of the defendant; (C) family circumstances; and (D) "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons

---

[2] Ms. Brady requested a compassionate release from the Warden at FCI Danbury (minimum security satellite camp) that was initially denied and again denied on appeal. ECF Nos. 41 at 4-5, 41-2, 41-3, and 41-4.

described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(A)-(D). While "[r]ehabilitation of the defendant alone" cannot constitute extraordinary and compelling reasons, the "Other Reasons" application note authorizes release for "an extraordinary and compelling reason other than, or in combination with, the [medical, age, or familial] reasons described in subdivisions (A) through (C)." 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13 cmt. n.1(D), 3.

Many courts have found that a risk of getting a serious illness from COVID-19 while incarcerated is an extraordinary and compelling reason warranting a compassionate release. *See United States v. Bischoff*, 460 F. Supp. 3d 122, 125 (D.N.H. 2020) (collecting cases); *see also United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020) (recognizing that "nothing could be more extraordinary and compelling than this pandemic"). To this end, courts have examined such motions with an eye toward each person's medical condition and risk. *See, e.g., United States v. Sawicz*, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020).

Additionally, the "Family Circumstances" Application Note lists two circumstances that may qualify one for compassionate release. U.S.S.G. § 1B1.13 cmt. n.1(C). The first is upon the "death or incapacitation of the caregiver of the defendant's minor child or minor children." *Id.* The second is upon the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 cmt. n.1(C)(ii). As other courts have explained the "animating principle of the Family Circumstances category is that there exists an extraordinary and

3

compelling reason for release when the defendant has a close family member who is completely unable to care for himself or herself and for whom the defendant would be the only available caregiver." *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020); *see also United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (granting motion where defendant was only available caregiver for his mother).

Ms. Brady has argued that she is at a higher risk of serious illness if she were to contract COVID-19 because she is an ex-smoker, is obese, is of Asian ethnicity, and has received cortisone injections. ECF No. 41 at 5. She also argues that her family circumstances are extraordinary and compelling reasons for release. *Id.*

### 1. Health issues

The CDC instructs that there are individuals who are incarcerated who are at a higher risk of serious illness if they were to contract COVID-19. The question in compassionate release cases is whether that increased risk is great enough to find extraordinary and compelling reasons to shorten a person's incarcerative sentence. In many cases, it is. *See, e.g., United States v. DeBartolo*, CR No. 14-016 WES, 2020 WL 3105032, at *2 (D.R.I. June 11, 2020) ("the Court concludes the comorbidity of these conditions would place Defendant at significantly higher risk for a poor outcome if he were to contract the COVID-19 virus.").

In this case, it is not. Of the three conditions Ms. Brady invokes as evidence of her increased risk, only smoking is considered to lead to an increased risk of severe

illness     from     the     virus     that     causes     COVID-19.[3]          *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 9, 2020).

Although the government challenges Ms. Brady's proof of her smoking history (ECF No. 44 at 6-7), the Court will assume the truth of her assertions, which were documented in her medical records with the Bureau of Prison. ECF No. 43 at 45, 53, 75. The problem with Ms. Brady's argument is that smoking history alone is not sufficient for this Court to find extraordinary and compelling grounds for release, especially when Ms. Brady is only forty-five years old and does not present with any additional comorbidities. *United States v. Greene*, No. 1:17-CR-00012-NT-1, 2020 WL 4475892, at *4 (D. Me. Aug. 4, 2020) (finding that a 40 year old former cigarette smoker with no other medical conditions that elevate risk of contracting COVID-19 did not establish extraordinary and compelling grounds for release); *but see United States v. Galaz*, Case No. 15-CR-02559-GPC, 2020 WL 4569125, at *4 (S.D. Cal. Aug. 7, 2020) (granting compassionate release based on defendant's history of smoking, obesity, and tuberculosis). Moreover, her records show no history of any respiratory problems or demonstrated lung damage. *See, e.g.*, *United States v. Blinks*, Case

---

[3] Ms. Brady also cites her Body Mass Index ("BMI") of 25.7 (ECF Nos. 41 at 9, 43 at 53) but the CDC considers above 30 as an increased risk factor. She cites getting a cortisone injection on October 8, 2020 and anticipates getting a second injection (*id.*), but the CDC notes that "*prolonged* use of corticosteroids" "might" put a person at an increased risk. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#immunocompromised-state (emphasis added) (last visited December 9, 2020). Finally, the CDC does not mention any increased risk based on a person's Asian ethnicity.

No. 1:17-CR-0248 AWI SKO, 2020 WL 5366728, at *2 (E.D. Cal. Sept. 8, 2020 ("While smoking is a consideration, the status of being a former smoker with no demonstrated lung damage does not increase the risk to an extent sufficient to constitute an extraordinary circumstance."); *United States v. Rich*, No. 17-CR-094-LM, 2020 WL 2949365, at *3-4 (D.N.H. June 3, 2020) (granting compassionate release based on defendant's history of smoking <u>and</u> chronic respiratory problems).

Ms. Brady is basically a healthy 45-year-old woman. ECF No. 24 at 13 ("She reported good physical health."). While she understandably suffers from anxiety and depression over her incarceration, she has not established extraordinary and compelling reasons for her release based on her medical or health condition.

### 2. *Family Circumstances*

Ms. Brady's second argument is, candidly, the harder argument to assess. Without going into details in an effort to respect her children's privacy, the Court reports that Ms. Brady's ex-husband Tom has presented a heart-breaking narrative of the lives of the children Ms. Brady has left behind. This Court has recognized that difficult family circumstances can be a basis for compassionate release. *See, e.g.*, *United States v. Dublin*, CR. No. 18-00102-JJM-LDA, ECF No. 28 (D.R.I. August 19, 2020).

The family left behind often bears the strongest burden of a family member's incarceration. This is true of persons from all socio-economic categories.

> Family members of incarcerated individuals are often referred to as 'hidden victims'—victims of the criminal justice system who are neither acknowledged nor given a platform to be heard. * * * Children whose parents are involved in the criminal justice system, in particular, face a

host of challenges and difficulties: psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity. It is difficult to predict how a child will fare when a parent is intermittently or continually incarcerated, and research findings on these children's risk factors are mixed.

https://nij.ojp.gov/topics/articles/hidden-consequences-impact-incarceration-

dependent-children (last visited December 9, 2020).

Suffice it to say that the impact of Ms. Brady's incarceration on her children is immense,[4] but it does not compel this Court to exercise its discretion to grant Ms. Brady release now. While Mr. Brady bears the tremendous burden that many single parents have living with and caring for children with many needs, the Brady children have the benefit of a loving father, supportive siblings, and economic means.[5] Ms. Brady's particular family circumstances, while difficult, do not support a compassionate release.

B.      Section 3553 Factors Analysis

The Court next analyzes the 18 U.S.C. § 3553 factors and then determine whether Ms. Brady poses a danger to the public. The government opposes Ms. Brady's motion on many § 3553 grounds.

---

[4] The Court also notes that Ms. Brady does not intend to live with the children if she is released but instead "she will reside in Providence, while spending her waking hours at her ex-husband's home caring for her son and minor daughter." ECF No. 41 at 5.

[5] It is not clear that Ms. Brady's release is the only answer to the family's predicaments. While it is undeniable that her children miss her, that some have high needs, and that sole parenting has fallen on the shoulders of her ex-husband and her other children, this is not very unlike the burdens that fall on many families of incarcerated relatives.

After reviewing Ms. Brady's Presentence Investigation Report (ECF No. 24) again, reviewing notes from the sentencing, and considering the § 3553 factors, the Court determines that it is not appropriate to release Ms. Brady now.

The Court imposed a sentence of eight years, yet Ms. Brady has served only nineteen months–about twenty percent of her sentence–with a current BOP release date of February 16, 2026.   The seriousness of the crimes Ms. Brady committed against her friends and family cannot be overstated and merit a long term of imprisonment to punish her, to deter her, and to deter others.   As the government states:

> Defendant spent years scheming to defraud her closest friends and family members out of their life savings by fraudulently claiming to perform rehabilitation projects on foreclosed homes.  Her victims ranged from the fairly well-off to those in dire financial straits.  She stole the life savings of the elderly woman who was a mother figure to Brady and a grandmother figure to Brady's children.   Brady convinced another older woman who was taking care of her paraplegic husband to give Brady all of her money and all the money of her parents who suffer from Alzheimer's.  Brady used her intelligence and charisma to gain the trust of 23 different people who collectively lost approximately $4.8M.  She did so simply to support her lavish lifestyle.

ECF No. 44 at 14.

As this Court said at the time of sentencing:

> The nature and circumstances of Ms. Brady's offense are beyond this Court's imagination of what an individual would do to their family and to their friends. Ms. Brady spent years deceiving her closest friends and family members, people who believed they could trust her as a friend, businesswoman.   As we've heard today, many of these victims are struggling financially before being defrauded and thought they were making safe investments with the person they knew, trusted, and respected.  Instead, they've suffered financial disaster, some losing their entire life savings. One of the most disturbing things that I read from the victims' letters was where some of them said that they felt

embarrassed and ashamed and guilty for what they did.  The range in financial and emotional devastation that Ms. Brady's fraud created is simply beyond belief.

**********

Fraud committed in any manner is serious, but what motivated Ms. Brady to prey on her vulnerable friends and family is particularly disturbing.  She committed her crimes to support a lavish lifestyle. Ms. Brady is a highly educated individual who chose to use her intelligence not to pursue a lawful career but instead to swindle others. With the money that her victims had entrusted in her, Ms. Brady went on lavish vacations, had elective plastic surgery, bought luxury items, and enjoyed being treated as a high roller at casinos, receiving free hotel rooms, meals, tickets to sporting events and concerts.

Nothing has changed this Court's opinion about the seriousness of the offense, the callousness in which Ms. Brady committed the offense, or the tremendous betrayal of trust that she exhibited toward her friends and family that "invested" with her.

Next, the Court considers the history and characteristics of this defendant. What was striking in reading Ms. Brady letter (ECF No. 43-5), was her complete failure to take any personal responsibility for the incredible hurt and damage she has caused her family.  Not once, in her four-page letter to the Court, did Ms. Brady even hint at expressing remorse for her actions that harmed her victims and her family. The letter read as though someone else besides her were responsible for the burden on her ex-husband and the difficulties her children are having.  This attitude leads the Court to doubt that her short incarceration has had much effect on her rehabilitation.

9

Finally, Ms. Brady has a history of destructively manipulative behavior.  The Court determined that Ms. Brady was prepared to flee the country leaving her husband and children behind when she learned her fraud was exposed.  As the Court said at sentencing:

> Ms. Brady's behavior after being alerted to the discovery of her fraud is also incredibly disturbing to this Court.  Ms. Brady first attempted to cover up by asking victims to destroy documents and delete e-mails that she had sent to them, and then in a most brazen act she reached out to law enforcement in an attempt to divert blame onto these blameless victims, and although Ms. Brady has allegedly accepted responsibility for this fraud by pleading guilty her behavior since the investigation and arrest has done little to convince this Court that she understands the gravity of her crimes and is, in fact, remorseful.  In fact, her behavior largely suggests just the opposite.  Prior to being indicted she purchased a one-way flight to Vietnam which in committing her to custody Magistrate Judge Almond determined was an attempt to flee.  This Court agrees.

In light of these past actions, the Court cannot say with any reasonable degree of confidence that Ms. Brady would abide by any of the restrictions that the Court would impose if it were to release her now.

In considering all the § 3553 factors of punishment, deterrence, public safety, rehabilitation, and Ms. Brady's personal characteristics, the Court finds that reducing her sentence at this time is neither appropriate nor consistent with the § 3553 factors.

## III.   CONCLUSION

The Court DENIES Ms. Brady's Emergency Motion for Compassionate Release.  ECF No. 41.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

December 11, 2020